# United States Court of Appeals
## For the First Circuit

No. 02-2215

UNITED STATES OF AMERICA,

Appellee,

v.

FAZAL-UR-RAHEMAN-FAZAL
a/k/a Fazal Raheman,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Selya, Circuit Judge,
Stapleton,* Senior Circuit Judge, and
Howard, Circuit Judge.

Robert Osuna, with whom Law Office of Robert Osuna, P.C. was
on brief, for appellant.
John T. McNeil, Assistant United States Attorney with whom
Michael J. Sullivan, United States Attorney, was on brief, for
appellee.

January 21, 2004

_____

* Of the Third Circuit, sitting by designation.

**HOWARD**, **Circuit Judge**.  Following a seven-day trial, a jury convicted defendant-appellant Fazal Raheman, M.D., of international parental kidnapping and illegal interception of wire communications.  See 18 U.S.C. §§ 1204 ("International Parental Kidnapping Crime Act" or "IPKCA") and 2511(1)(a).  This lengthy appeal requires us to decide, inter alia, (1) whether a parent can be prosecuted under IPKCA for conduct that would not be criminal under state law; and (2) whether the district court had sentencing authority to impose upon Raheman an order requiring his immediate cooperation in the return of the children.  We hold that (1) such a prosecution is consistent with the language and intent of the statute; and (2) the district court did not have authority to impose such an order.

## I.

We set forth the facts in the light most favorable to the verdict.  See United States v. Diaz, 300 F.3d 66, 69 (1st Cir. 2002).

After marrying Saihba Ali in India in May 1990, Raheman and his wife returned to Massachusetts, where he had been employed for the past year.  In 1992, the couple became permanent residents.  Later that year, their child, a daughter, was born in Massachusetts, making her an American citizen by birth.  A son was born in India in 1996; he became a naturalized American citizen two years later.

By 1996, Ali's and Raheman's marriage was suffering. Raheman had become concerned that Ali had become too independent, and he had repeatedly threatened to send the children to India to live with his mother if her behavior persisted. On September 17, 1997, Ali moved herself and the children from the family home in Burlington, Massachusetts, to an apartment in Cambridge, Massachusetts.

Displeased by his wife's action, Raheman again threatened to move the children to India. He also told Ali that, if she went to the police or the courts regarding their separation or his threats, he "would become a lethal weapon." In early October 1997, Ali informed Raheman that, because of his threats, she would have to go to the police or courts for help. Raheman then changed his tactics and told her that he would not remove the children to India. He requested, however, that she not take him "in front of a judge." At this juncture, Raheman and Ali began to discuss legal separation, but Raheman insisted that the separation take place without resort to the American legal system.

Meanwhile, Raheman was covertly monitoring his wife's activities. He had a miniature video camera surreptitiously installed in her bedroom, hired a private investigator to follow and videotape her, and asked his nephew to move into Ali's apartment building to spy. In addition, from November 1, 1997, through November 11, 1997, Raheman tapped Ali's apartment

telephone. During this period, he surreptitiously recorded "more than 100 hours" of her private conversations.

On November 14, 1997, Raheman traveled to his former home in Nagpur, India. There, he enrolled his daughter in school and filed a petition for custody of the children in the Nagpur Family Court, alleging that his wife was engaged in an adulterous relationship and that, as a result, he should be awarded custody. He returned to the United States on November 18, 1997.

On November 25, 1997, Raheman arranged to visit his children the next day. Raheman informed Ali that he planned to take the children to a museum and would return them later in the evening. He told Ali nothing of his recent trip to India. Later that same day, he purchased airline tickets for himself and the children to fly from New York to India on November 26th. The children's tickets were one way.

After picking up the children early in the afternoon on November 26th, Raheman drove to New York but missed the flight. They flew to India the next day. At the time Raheman left the United States, he and Ali were still married and there existed no court order or agreement between them affecting custody of the children.

At Raheman's request, one of his cousins telephoned Ali with the news that Raheman and the children were on a flight to India. After receiving this call, Ali called the police to report

that her children had been kidnapped.  Two days later, Ali obtained from a Massachusetts Probate Court an emergency custody order, which a Cambridge police officer subsequently read to Raheman over the telephone.  Soon thereafter, on December 2, 1997, Raheman obtained his own custody order from the Nagpur Family Court.

Between November 1997 and August 1998, Ali sought the assistance of several federal agencies in an unsuccessful attempt to obtain lawful physical custody of her children.  In addition, she obtained United States citizenship for herself and her son and hired a lawyer in India.

In late August 1998, Ali traveled to India to attempt to obtain custody of her children from the India courts. Raheman fought her efforts and filed several criminal complaints against her.  Before Indian authorities could apprehend her, Ali fled to the United States.  In September 2000, while Ali was in the United States, Raheman obtained from the Indian court a second custody order based primarily on a provision of Islamic law that grants a father full custody if the mother lives a significant distance from the father.

On July 25, 2001, Raheman was indicted by a federal grand jury on one count of international parental kidnapping. See 18 U.S.C. § 1204.  Later in 2001, upon returning to the United States to participate in a civil lawsuit, Raheman was arrested on the

federal charge. On January 16, 2002, a grand jury returned a superseding indictment which added one count of unlawful wiretapping. See 18 U.S.C. § 2511(1)(a). On March 6, 2002, Raheman was convicted on both counts. He was sentenced to three years of imprisonment, to be followed by three years of supervised release. Additionally, he was ordered to cooperate immediately in the return of the children to Ali's custody.

This appeal followed.[1]

## II.

We are presented with six issues on appeal: (1) whether Raheman's conduct falls within the criminal prohibitions of IPKCA, and, if so, whether the statute is unconstitutional as applied to him; (2) whether the district court erred in instructing the jury that, as a matter of law, both Ali and Raheman had parental rights to physical custody of the children at the time Raheman took them to India; (3) whether the district court abused its discretion in admitting evidence of threats allegedly made by Raheman against Ali; (4) whether the jury instructions on the wiretapping charge were constitutionally insufficient in light of Apprendi v. New Jersey, 530 U.S. 466 (2000); (5) whether the district court imposed

---

[1]On December 23, 2002, subsequent to filing his notice of appeal, Raheman filed a motion to set aside his conviction pursuant to 28 U.S.C. § 2255. That motion is pending in the district court.

an improper "forthwith" order; and (6) whether trial counsel was ineffective.[2]

## A. **The International Parental Kidnapping Crime Act**

Raheman's principal argument on appeal is that his IPKCA conviction should be reversed for two separate reasons: (1) "the evidence adduced at trial . . . fails to state a crime [under IPKCA]" because the charged conduct has not been criminalized by state law; and (2) the statute "is unconstitutional as applied to [him]."  Our standard of review is de novo.  See United States v. Robinson, 137 F.3d 652, 653 (1st Cir. 1998) ("We review de novo constitutional challenges to federal statutes."); United States v. Jones, 10 F.3d 901, 904 (1st Cir. 1993) ("Statutory interpretation is a question of law and, therefore, is subject to de novo review.").

We note at the outset an undisputed fact: under Massachusetts law, Raheman did nothing criminal.  In Commonwealth v. Beals, 541 N.E.2d 1011, 1015 (Mass. 1989), the Supreme Judicial Court made clear that "[a] parent who has taken his or her children from the other parent before there was any court proceeding cannot be convicted of parental kidnapping under [Mass. Gen. L. ch.] 265,

---

[2]Raheman has also raised several pro se arguments, each of which we have considered.  Because these arguments are without merit, we summarily reject them.

§ 26A." (emphasis added).[3]  Since Raheman removed his children --

residents of Massachusetts -- prior to such a proceeding, he could

not have been convicted of kidnapping under state law.  Of course,

that a particular State fails to prohibit certain conduct does not

obligate Congress to do the same.

**(1) Statutory Analysis**

        In 1993, by virtue of its commerce power, see United

States v. Cummings, 281 F.3d 1046, 1051 (9th Cir.), cert. denied,

537 U.S. 895 (2002), and to "deter the removal of children from the

United States to foreign countries in order to obstruct parental

rights," Congress passed the International Parental Kidnapping

Crime Act, which creates a "[f]ederal felony offense of

international parental kidnapping."  H.R. Rep. No. 103-390, at 1

(1993), reprinted in 1993 U.S.C.C.A.N. 2419, 2419 (emphasis added).

The legislative history explains that IPKCA was enacted as a

domestic response to issues left unaddressed by international law:

> There is an international civil mechanism
> relating to these cases, the Hague Convention
> on International Parental Child Kidnapping,

---

[3]Mass. Gen. L. ch. 265, § 26A provides as follows:

Whoever, being a relative of a child less than eighteen
years old, without lawful authority, holds or intends to
hold such a child permanently or for a protracted period,
or takes or entices a child from his lawful
custodian . . . shall be punished by imprisonment . . . .

(emphasis added).

for which Congress passed implementing legislation in 1988. As a result of this convention, the signatories will recognize the custody decrees of other signatories, thereby facilitating the return of abducted children. However, most countries (including India) are not signatories to the Convention, thus leaving individual countries to take whatever legal unilateral action they can to obtain the return of abducted children.

Creating a federal felony offense responds to these problems . . . .

Id. at 3 (parenthetical and emphases added).

With these goals in mind, the statute provides, in pertinent part, as follows:

(a) Whoever removes a child from the United States, or attempts to do so, or retains a child (who has been in the United States) outside the United States with intent to obstruct the lawful exercise of parental rights shall be fined under this title or imprisoned not more than 3 years, or both.

(b) As used in this section -- . . . (2) the term "parental rights", with respect to a child, means the right of physical custody of the child -- (A) whether joint or sole (and includes visiting rights); and (B) whether arising by operation of law, court order, or legally binding agreement of the parties.

18 U.S.C. § 1204.

Raheman was convicted under § 1204(a) for "remov[ing] a child from the United States . . . or retain[ing] a child . . . outside the United States with intent to obstruct the lawful exercise of parental rights" -- conduct that, as indicated above, is not criminal under Massachusetts law. See Beals, 541 N.E.2d at

-9-

1015. He now argues that the government "has made a federal offender out of a person [acting] in the lawful exercise of his own parental rights granted under his own state law [thereby] . . . creat[ing] an impermissible expansion of the use of IPKCA beyond that which was intended by Congress." More specifically, he contends that, "absent a custody order, a person may not be properly charged with either removal or retention" of his own child.

We are thus presented with the question of whether a parent can be convicted under IPKCA for engaging in conduct that would not itself be criminal under state law. It is a question of first impression in this circuit and one we answer in the affirmative.

That IPKCA looks to state <u>family</u> law for purposes of defining "parental rights," <u>see</u> 18 U.S.C. § 1204(b)(2); <u>see</u> <u>also</u> H.R. Rep. at 4 ("'Parental rights' are to be determined by reference to state law . . . ."), does not in any way suggest that the statute depends upon state <u>criminal</u> law to delineate the realm of circumstances through which such rights are transgressed. By prohibiting those situations in which a parent "removes a child from the United States . . . with intent to obstruct the lawful exercise of parental rights," 18 U.S.C. § 1204(a), Congress went further than Massachusetts, which does not criminalize such conduct absent a prior court proceeding. <u>See</u> <u>Beals</u>, 541 N.E.2d at 1015;

cf. <u>Cummings</u>, 281 F.3d at 1051 ("[W]hile we recognize that issues of family law are usually matters for the States, IPKCA deals first and foremost with international parental kidnapping, which is an area not traditionally reserved to the States. We therefore reject [defendant's] argument that § 1204(a) trammels the States' authority.").

Nowhere in the text of the statute or the legislative history does Congress limit the criminal prohibition in 18 U.S.C. § 1204(a) to only those acts that are criminal under state law. <u>Compare</u> 18 U.S.C. § 1204(a) ("<u>Whoever</u> removes a child from the United States, or attempts to do so . . . .") <u>with</u> Mass. Gen. L. ch. 265, § 26A ("<u>Whoever</u> . . ., <u>without lawful authority</u>, holds or intends to hold such a child permanently or for a protracted period . . . .") (emphases added). Congress could have provided for the imprisonment of any person who, <u>in violation of State law</u>, removes a child from the United States. It did not do so, and this court will not infer such a limitation where the statutory language does not support it. <u>See</u> <u>Campanale & Sons, Inc.</u> v. <u>Evans</u>, 311 F.3d 109, 117 (1st Cir. 2002) ("Our general rules of statutory interpretation dictate a narrow course for us on review: unless the statutory language is ambiguous, we generally are limited by its plain meaning." (citation omitted)).

Although none of our sister circuits has addressed the issue here presented, some have had the opportunity to apply IPKCA.

-11-

See <u>United States</u> v. <u>Amer</u>, 110 F.3d 873, 878-79 (2d Cir. 1997) (affirming defendant's conviction under IPKCA without referring to New York's criminal law); <u>United States</u> v. <u>Alahmad</u>, 211 F.3d 538, 541 (10th Cir. 2000) (affirming defendant's conviction under IPKCA -- without reference to Colorado's criminal law -- upon concluding that a grandparent had a "parental right" by virtue of a state court order); <u>United States</u> v. <u>Cummings</u>, 281 F.3d 1046 (9th Cir. 2002) (affirming conviction without an examination of the State of Washington's criminal law). Raheman argues that the holdings in these cases support his view of the statute. They do not, for neither the Second Circuit in <u>Amer</u>, nor the Tenth Circuit in <u>Alahmad</u>, nor the Ninth Circuit in <u>Cummings</u> held -- or otherwise hinted -- that the respective convictions under IPKCA hinged on the criminal law of the respective State.

Having determined that a parent can be prosecuted under IPKCA without necessarily having violated state criminal law, we must next consider whether Raheman is such a parent. In short, we agree with the government that Raheman's conduct was a "textbook case of international parental kidnapping, falling squarely within the ambit of the federal statute."

On the day Raheman removed the children from Massachusetts to India, Ali had a "right of physical custody" of the children under Massachusetts law. <u>See</u> 18 U.S.C. § 1204(b); <u>see also</u> <u>Beals</u>, 541 N.E.2d at 1014 ("[T]he law of Massachusetts

-12-

recognizes both parents' equal rights to custody of their children." (citations omitted)). In <u>Beals</u>, the Supreme Judicial Court expressly recognized "the principle that, prior to a court order, <u>both</u> parents have lawful custody of their children . . . ." <u>Id.</u> (emphasis added). That Raheman and Ali shared custody of their children is of no import under the federal statute. <u>See</u> 18 U.S.C. § 1204(b)(2) ("[T]he term 'parental rights,' with respect to a child, means the right of physical custody of the child -- (A) <u>whether joint or sole</u> (and includes visiting rights); and (B) whether arising by <u>operation of law</u>, court order, or legally binding agreement of the parties." (emphases added)). Accordingly, for IPKCA purposes, Ali had "parental rights" that were federally enforceable and incapable of being extinguished by Raheman's ability under state law to take exclusive possession of the children without repercussion. <u>See</u> Art. VI, cl. 2, U.S. Const. The jury having found that Raheman removed his children from the United States with the "intent to obstruct the lawful exercise" of these rights, 18 U.S.C. § 1204(a), we conclude that Raheman was properly convicted of a federal offense under IPKCA.

**(2) Constitutional Considerations**

Raheman next argues that, because he had no notice that he was committing a crime, IPKCA deprives him of his constitutional rights to due process. <u>See</u> U.S. Const., Amend. V. Specifically, he contends that

> [n]owhere in the IPKCA text, the case law, or the legislative history does it state that a parent will be prosecuted under IPKCA when exercising their own rights under state law. Nowhere is there an expressed or even implied intent to alter, expand, subvert or ignore state custody law/rights. . . . As in this case, if a defendant is not violating a court order, a legally binding agreement or the operation of his own state law . . ., he has not been given notice of a crime [that] he is committing outside of these parameters.

We are unpersuaded. Both IPKCA's language and its application to Raheman's situation are straightforward: so long as Ali had "parental rights" -- a term encompassing even mere visitation rights -- Raheman was not permitted to take the children outside the United States with the intent to obstruct those rights. See 18 U.S.C. § 1204(a). We therefore conclude that Raheman had fair warning under the statute; in other words, as here applied, IPKCA's prohibitions were "sufficiently definite to apprise a person of ordinary intelligence that his anticipated behavior will transgress the law." United States v. Arcadipane, 41 F.3d 1, 5 (1st Cir. 1994) (citation omitted). That Raheman might have been ignorant of IPKCA or confused about Congress's authority to prohibit conduct not proscribed by state law is insufficient to prove a deprivation of due process. See United States v. Denis, 297 F.3d 25, 28 (1st Cir. 2002) ("It is a fundamental maxim of our legal system that 'ignorance of the law or a mistake of law is no defense to criminal prosecution.'") (quoting Cheek v. United States, 498 U.S. 192, 199 (1991)).

## B.  **Jury Instructions as to Ali's Parental Rights**

Raheman next complains that the district court erred in
instructing the jury that, as a matter of law, Ali had "parental
rights" under Massachusetts law.[4]  He argues that, because such a
question is "a mixed question of law and fact for the jury," these
instructions violated his constitutional right to a jury trial.
Raheman concedes that he did not offer a contemporaneous objection
to the instruction.  Nevertheless, he contends that the court's
failure to instruct the jury on the "parental rights" element of

_____

[4]Regarding the parental kidnapping charge, the district court
instructed the jury, in pertinent part, as follows:

> Now, what are these "parental rights" that we've been
> talking about?  I'm about to instruct you on that.
>
> The term "parental rights," with respect to a child,
> means the right to physical custody of the child, whether
> joint or sole, and includes visitation rights.
>
> The right to physical custody or visitation can arise in
> three ways: by operation of law, by court order, or by a
> legally binding agreement.  The right to physical custody
> is the right to actual possession and control of a child.
>
> In Massachusetts, both parents have joint custody of a
> minor child prior to the intervention of a court.  'The
> law of Massachusetts recognizes both parents' equal
> rights to custody of their children. . . . Prior to a
> court order, both parents have lawful custody of their
> children.'  Both parents' right to physical custody
> continues unless and until it is terminated by specific
> legal proceedings.  <u>Because there was no court order from
> any court and no legally binding agreement between the
> parties, on November 26, 1997, both Dr. Raheman and Ms.
> Ali had the right to physical custody of their children.</u>

(emphasis added).

-15-

the offense was a structural error which requires "automatic reversal."

Raheman's "automatic reversal" argument is wrong because the alleged error is not "structural."[5]  The Supreme Court has limited the definition of a structural error to those errors that "infect the entire trial process."  See Brecht v. Abrahamson, 507 U.S. 619, 630 (1993).  The Court has classified an error as structural in only "a very limited class of cases."  Johnson, 520 U.S. at 468.  Examples include complete denial of counsel, see Gideon v. Wainwright, 372 U.S. 335 (1963), presence of a biased trial judge, see Tumey v. Ohio, 273 U.S. 510 (1927), racial discrimination in the selection of a grand jury, see Vasquez v. Hillery, 474 U.S. 254 (1986), denial of self-representation at trial, see McKaskle v. Wiggins, 465 U.S. 168 (1984), denial of a public trial, see Waller v. Georgia, 467 U.S. 39 (1984), and offering a defective reasonable doubt instruction, see Sullivan v. Louisiana, 508 U.S. 275 (1993).  Moreover, the Court has expressly held that the error Raheman alleges -- that the instructions omitted an element of the offense from the jury's consideration --

---

[5]Even if this were a structural error, Raheman would still not be entitled to "automatic reversal" because he failed to preserve his objection.  In Johnson v. United States, 520 U.S. 461, 466 (1997), the Supreme Court assumed that an error was "structural" but nevertheless held that, because the defendant had failed to preserve his objection, "plain error" appellate review applied. See also United States v. Randazzo, 80 F.3d 623, 631-32 (1st Cir. 1996) (predicting Supreme Court ruling that unpreserved structural errors would be subject to plain error review).

does not constitute structural error.  See Neder v. United States, 527 U.S. 1, 7-11 (1999).  Just this term, the Supreme Court unanimously reiterated that "the trial court's failure to instruct a jury on all of the statutory elements of an offense is subject to harmless-error analysis" and therefore is not a structural error. Mitchell v. Esparza, 124 S.Ct. 7, 11 (2004) (per curiam) (citing cases).

In both Mitchell and Neder, the Supreme Court distinguished its decision in Sullivan v. Louisiana, 508 U.S. 275 (1993) -- the primary case on which Raheman relies to argue that he is entitled to "automatic reversal."  In Sullivan, the Court held that the trial court committed a structural error by failing to instruct the jury that the government must prove the elements of an offense beyond a reasonable doubt because failing to provide a correct reasonable doubt instruction "vitiates all the jury's findings."  Id. at 281 (emphasis in original).  Mitchell and Neder distinguished Sullivan because, while the erroneous reasonable doubt instruction in Sullivan affected all of the jury's findings, the failure to instruct the jury on a single element of an offense does not have the same impact on the jury's other conclusions.  See 124 S.Ct. at 11; 527 U.S. at 11.  Accordingly, the Court determined that an appellate court should examine the evidence introduced at trial to decide if the trial court's failure to instruct on a single element of the offense was harmless.  Id.  Because Raheman's

-17-

argument resembles Neder and Mitchell, in that he alleges that the district court prevented the jury from considering one element of the offense (i.e., the existence of parental rights), Sullivan's automatic reversal rule does not apply.

Having concluded that Raheman's underlying argument, if correct, does not mandate automatic reversal, we apply our traditional plain error analysis to review his claim. See Fed. R. Crim. P. 52(b). To establish plain error, Raheman must demonstrate (1) an error, (2) that is plain, (3) that affects substantial rights (i.e., the error was not harmless), and (4) that seriously undermines the fairness, integrity, or public reputation of judicial proceedings. See Ramirez-Burgos v. United States, 313 F.3d 23, 29 (1st Cir. 2002). Because we conclude that any error did not affect Raheman's "substantial rights," we proceed directly to the third prong of the plain error analysis.

Under IPKCA, parental rights (e.g., the right to physical custody of the child whether joint or sole) can be defined by operation of law, court order, or legally binding agreement. The district court began its instructions by telling the jury that, under Massachusetts law, both parents, absent a court order or legally binding agreement, maintain equal rights to the physical custody of their children. "In criminal cases . . . the judge must be permitted to instruct the jury on the law and to insist that the jury follow [her] instructions." United States v. Gaudin, 515 U.S.

-18-

506, 513 (1995). Thus, where a federal prosecution hinges on an interpretation or application of state law, it is the district court's function to explain the relevant state law to the jury. See United States v. Clements, 588 F.2d 1030, 1037 (5th Cir. 1979). Accordingly, the district court acted properly by explaining to the jury the Massachusetts definition of parental rights.

The only possible error in the district court's instruction was that it did not permit the jury to apply the relevant facts to the legal definition of parental rights to decide whether this element of the crime had been satisfied.[6] See Gaudin, 515 U.S. at 513 (noting that the jury must decide "guilt or innocence on every issue, which includes application of the law to the facts"). Deciding whether Ali had parental rights under Massachusetts law required the determination of three factual issues: (1) whether Ali was the mother of the children; (2) whether there existed a court order altering the custody rights as established by operation of law; and (3) whether there existed an agreement between her and Raheman altering the custody rights.

The answers to these questions were never in dispute. There was no evidence whatsoever that Ali did not possess parental rights under Massachusetts law. Ali's maternity status was undisputed, and there was no evidence of a court order or binding

---

[6]After providing the definition of parental rights, the court instructed that Ali had parental rights over the children as a matter of law.

-19-

agreement between the parties that altered the custody status of the children prior to their removal.  Thus, even if the instruction erroneously took the issue from the jury, the error did not affect Raheman's "substantial rights" because no reasonable jury could have harbored a reasonable doubt that Ali possessed parental rights over the children under Massachusetts law.  Accordingly, there was no plain error in the district court's instruction.

### C.  **Evidentiary Ruling**

Raheman next argues that the district court erred in admitting "overly prejudicial [Fed. R. Evid.] 404(b) evidence" of alleged domestic violence.  Our review is for abuse of discretion. See Larch v. Mansfield Mun. Elec. Dept., 272 F.3d 63, 72 (1st Cir. 2001); see also Udemba v. Nicoli, 237 F.3d 8, 14 (1st Cir. 2001) ("[A] trial court enjoys considerable discretion in connection with the admission or exclusion of evidence. . . .").

In the fall of 1997, following the marital separation, Raheman allegedly made two threats against Ali.  At trial, Ali provided the following testimony regarding these two incidents:

> ALI: Initially, he seemed mystified that I had . . . moved out of the house, and he wanted to know . . . why that happened. And then, the next day, he was extremely angry and upset and he came over to the house and he told me that he was going to take my daughter, Nida, to India and he came looking for her passport. . . . And then, he said, 'I'm going to come back here tomorrow and drag you by the hair and I'm going to take you home.'
>
> DEFENSE COUNSEL: Objection.

-20-

COURT: Overruled.

. . .

ALI: [Then,] [h]e told me that if I went to the police or the court for a separation or anything like that, he would become a lethal weapon . . . .[7]

Prior to trial, the district court had determined that the evidence of these threats was outside the purview of Fed. R. Evid. 404(b):

And anything that happened in September, October, November [1997] are part of the buildup . . . . Issues of adultery, issues of domestic abuse -- their relationship in that critical time period is essential to both of

---

[7]Following this testimony, Ali was asked whether Raheman had made any comments about restraining orders. Raheman objected, the district court overruled his objection, and Ali responded:

He said to me that, if you thought that you could go to the police and get a restraining order against me, that's not going to help you because a restraining order comes into effect only when it's violated and then it could be too late.

Raheman thereafter objected and moved for a mistrial. At a sidebar conference, the judge expressed some concern about the graphic nature of both the restraining-order evidence and the threat evidence already admitted, stating at one point that she might have excluded the evidence under Rule 403 had she known its nature in advance. The court thereafter denied Raheman's mistrial motion but struck the restraining-order testimony, instructing the jury that such evidence had "nothing to do with this particular proceeding." The court did not, however, strike the threat evidence that had earlier been admitted.

Thus, our task is to decide whether the admission of the remaining threat evidence was within the court's discretion. For the reasons set forth in the text, we conclude that it was. We also reject Raheman's contention that the district court erred in denying his motion for a mistrial.

-21-

their states of mind. . . . I don't think they're 404(b)'s. I think that's just part of understanding your intent and your state of mind.

Fed. R. Evid 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the <u>character of the person in order to show action in conformity therewith</u>" (emphasis added). Here, the district court supportably concluded that Ali's testimony was not being introduced as evidence of Raheman's character for violence or criminal propensity; rather, it was being introduced as part of Ali's necessary description of the events leading up to the crimes and as intrinsic evidence of an element of the charged offense -- Raheman's intent to obstruct the lawful exercise of Ali's parental rights. <u>See, e.g.</u>, <u>United States</u> v. <u>Shea</u>, 159 F.3d 37, 39 (1st Cir. 1998). Accordingly, the court acted within its discretion both in declining to treat the testimony as "404(b) evidence" and in determining its admissibility under Rules 401 and 403.

Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Here, the district court supportably treated the evidence of Raheman's threats as relevant because, as stated above, it tends to show that Raheman intended to deprive Ali of her parental rights. Specifically, Ali's testimony as to the nature of the marriage and the manner in which

it dissolved (including the threats) provided a glimpse into Raheman's otherwise internalized state of mind, thereby assisting the jury in understanding the motivating factors behind Raheman's decision to kidnap the children. From this evidence, the jury easily could have inferred that Raheman held a great deal of animus towards Ali, that (should she take any action) he intended to punish her, and that, by kidnapping the children, he accomplished his goal.

So too did the district court act within its discretion in not barring the evidence under Rule 403, which permits the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Raheman contends that the "evidence was used for nothing more than to prejudice the jury by demonstrating criminal propensity and for stirring up in the jury, anti-Muslim fervor."[8] But there is no indication that this evidence did –- or could have -– caused such a stir. Nor is there any indication that the government attempted to draw upon any anti-Muslim prejudices that might have existed. Indeed, given the fact that both the mother and the children were themselves Muslim, Raheman's assertion is a bit difficult to comprehend. Accordingly, we cannot conclude that admitting the challenged evidence was an abuse of discretion. See Freeman v. Package Machinery Co., 865 F.2d 1331, 1340 (1st Cir. 1988) ("Only

---

[8]For support, Raheman notes that "[t]he trial occurred in Boston less than one year after the terror attacks of September 11, 2001."

-23-

rarely -- and in extraordinarily compelling circumstances -- will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect."); see also United States v. Currier, 821 F.2d 52, 55 (1st Cir. 1987) ("[W]e will interpose our judgment only if a complaining party can demonstrate that the district court's ruling did not fall within the ambit of reasonable debate.").

## D. **Apprendi Allegation**

Turning to the wiretapping conviction, Raheman contends that "[t]he district court created a structural defect in not instructing the jury on the separate offenses included in 18 U.S.C. § 2511." Specifically, he claims that the Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466 (2000), required the district court to instruct the jury on the "three separate offenses" that comprise 18 U.S.C. § 2511(4) because each "offense" has a different maximum penalty provision. In considering this argument, we again apply plain-error review because of Raheman's failure to object at trial.[9] See supra at 18 (listing elements of plain-error review). This time, because there was no error, Raheman's argument

---

[9]Raheman argues again that this error was "structural" and therefore we should not apply plain error review. As we explained above, plain error applies even if the alleged error is properly classified as structural. See supra at 16 n.5; see also United States v. Pérez-Ruiz, 353 F.3d 1 (1st Cir. 2003) (holding that Aprrendi error is not structural). In any event, as explained below, there was no error at all.

falters at the first step of the plain-error analysis. 18 U.S.C. § 2511(4) does not define three separate offenses; it defines one offense with several possible mitigating factors. As we will explain, these mitigating factors do not need to be submitted to the jury under Apprendi.

We begin with the relevant terms of 18 U.S.C. § 2511.[10] That statute makes it unlawful, inter alia, to intentionally intercept any wire, oral or electronic communication.[11] For punishment, the statute refers to 18 U.S.C. § 2511(4), which provides that a person in violation of 18 U.S.C. § 2511(1)(a) "shall be fined . . . or imprisoned [for] not more than five years, or both" and then defines limited circumstances under which a defendant is eligible for a shorter maximum sentence. If the offense is, inter alia, (1) a first offense, (2) that was not committed for a tortious or illegal purpose or for a commercial advantage or gain,

---

[10]This statute was recently amended, but Raheman's trial occurred before the amendments took effect. We refer throughout to the pre-amendment version of the statute.

[11]18 U.S.C. §2511(1)(a) states, in pertinent part:

Except as otherwise specifically provided in this chapter any person who intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication . . . shall be punished as provided in subsection (4).

(3) and the intercepted communication is not scrambled or encrypted, the defendant may receive a reduced maximum penalty.[12]

Raheman claims that <u>Apprendi</u> mandates that the jury consider these additional factors as elements of the offense because they determine the applicable maximum sentence.  He is wrong.

---

[12]18 U.S.C. § 2511(4) provides, in pertinent part:

(a) [W]hoever violates subsection (1) of this section shall be fined under this title or imprisoned not more than five years, or both.

(b) If the offense is a first offense under paragraph (a) of this subsection and is not for a tortious or illegal purpose or for purposes of direct or indirect commercial advantage or private commercial gain, and the wire or electronic communication with respect to which the offense under paragraph (a) is a radio communication that is not scrambled, encrypted, or transmitted using modulation techniques the essential parameters of which have been withheld from the public with the intention of preserving the privacy of such communication, then--

   (i) if the communication is not the radio portion of a cellular telephone communication, a cordless telephone communication that is transmitted between the cordless telephone handset and the base unit, a public land mobile radio service communication or a paging service communication, and the conduct is not that described in subsection (5), the offender shall be fined under this title or imprisoned not more than one year, or both; and

   (ii) if the communication is the radio portion of a cellular telephone communication, a cordless telephone communication that is transmitted between the cordless telephone handset and the base unit, a public land mobile radio service communication or a paging service communication, the offender shall be fined under this title.

In _Apprendi_, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that _increases_ the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490 (emphasis added). The Court stressed that its decision applied "to facts in aggravation of punishment" but not to "facts in mitigation." _Id._ at 490 n.16. It explained that, where a judge finds a fact that allows a defendant to "escape the statutory maximum," the judge is "neither expos[ing] the defendant to a deprivation of liberty greater than that authorized by the verdict according to statute, nor . . . imposing upon the defendant a greater stigma than that accompanying the jury verdict alone." _Id._ Therefore, facts that, if found, would only decrease the otherwise-applicable maximum sentence (_i.e.,_ mitigating factors) may, consistent with _Apprendi_, be decided by the court. _Id._

The Second, Fourth, and Sixth Circuits, in applying _Apprendi_, have established a useful methodology for distinguishing between aggravating and mitigating factors. _See_ _United States_ v. _Hamlin_, 319 F.3d 667, 670-71 (4th Cir. 2003); _United States_ v. _Campbell_, 317 F.3d 597, 603 (6th Cir. 2003); _United States_ v. _Outen_, 286 F.3d 622, 636-39 (2d Cir. 2002). Under this methodology, the court first ascertains the "baseline" or "default" statutory provision (_i.e.,_ the provision which states a complete crime upon the fewest facts). The court then examines the additional

-27-

sentencing provisions to determine their effect on the maximum punishment described in the baseline. If a fact increases the maximum penalty, it is an aggravating factor that must be submitted to the jury under Apprendi. If a fact decreases the maximum penalty, it is a mitigating factor that may be decided by the court. See Outen, 286 F.3d at 639.

Applying this methodology to 18 U.S.C. § 2511(4) demonstrates that the statute establishes one crime with several possible mitigating factors. The baseline crime provides that any individual who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral or electronic communication . . . shall be fined . . . or imprisoned not more than five years, or both." 18 U.S.C. § 2511(1)(a) & (4)(a). The statute then states that if "the [baseline] offense" was committed under certain factual circumstances, lower maximum sentences apply. 18 U.S.C. § 2511(4)(b). Thus, the additional facts stated in 18 U.S.C. § 2511(4)(b), if found, would have served only to decrease the maximum sentence which Raheman faced for violating the baseline offense stated in 18 U.S.C. § 2511(1)(a). Therefore, there was no Apprendi error in the district court deciding for itself whether Raheman met these mitigating factors.

### E. The "Forthwith" Order

Raheman next contends that "the [district] court erred in imposing as a condition of supervised release that [he] shall 'forthwith' take all reasonable measures to return the children to the United States." See U.S.S.G. § 5D1.3(b) (authorizing the court to impose, in addition to the mandatory conditions of supervised release, "other conditions of supervised release" to the extent that such conditions comply with various statutory requirements). Because the imposition of the challenged order hinges upon the sentencing court's conclusions of law, our review is plenary. See United States v. Matos, 328 F.3d 34, 38 (1st Cir. 2003).

In its imposition of judgment, under the heading "Conditions of Supervised Release," the district court imposed upon Raheman the standard conditions -- with a single addition:

> The Defendant shall <u>forthwith</u> take all reasonable measures within his control to return the children to the United States so that the Middlesex Probate Court (or other appropriate court) may determine child custody issues, and shall cooperate with all authorities in the United States, India, and elsewhere, to effectuate their return.

(emphasis added).

Due to its "forthwith" language, this order generated significant confusion. On three separate occasions, the court elaborated the provision's meaning: in an order dated November 18, 2002, the court noted that "the order went into effect immediately pursuant to 18 U.S.C. § 3664(f)(4) and 28 U.S.C. § 1651 [because]

-29-

[s]taying the order until supervised release would frustrate the rights of the victims (the mother and the two children) and [would] be unenforceable because defendant will be deported"; in an order dated February 11, 2003, the court again emphasized that "[t]he order was made effective <u>immediately</u> upon entry of judgment because postponement of the effective date of the order until the start of supervised release would not provide an adequate remedy for the victims of the crime . . ." (emphasis retained); and, at a hearing in March 2003, the court explained that, "if it hasn't been crystal clear, which I think it has been, let me just reiterate, it was forthwith -- it was not a condition of supervised release, because by the time I hit supervised release, the children are of an age where either it's just a moot point or under Muslim law, I'm told, it makes a difference . . . ."[13] At the March 2003 hearing, the court denied the government's request for a contempt hearing, stating: "I have denied it, because I want to see what the First Circuit is going to do first . . . . [U]sually all orders are conditions of supervised release. This is different. This was immediate, forthwith, as you all know, because otherwise you basically removed the relief."

Clearly, then, despite its placement under the heading "Conditions of Supervised Release," the challenged order was <u>not</u> a

---

[13]The district court was presented with information that, under Islamic law, a mother has a right of physical custody only until daughters reach puberty and sons reach the age of seven.

condition of supervised release; rather, it was an order designed to take effect immediately (*i.e.*, while Raheman was serving his prison term). So understood, the authority to pass such an order could not derive from U.S.S.G. § 5D1.3 because the provisions of that guideline only involve "conditions of supervised release." *See also* 18 U.S.C. § 3624(e) ("The term of supervised release commences on the day the person is released from imprisonment . . . ."). Accordingly, we must decide whether, as the government argues, there exists an alternate source of authority under either (1) the restitution statutes; or (2) the All Writs Act.

**(1) Restitution Statutes**

A sentencing court has authority to impose restitution. *See* 18 U.S.C. § 3663(a) (authorizing statute); *see also id.* § 3553(a) ("The court, in determining the particular sentence to be imposed, shall consider -- . . . the need to provide restitution to any victims of the offense."). Specifically, 18 U.S.C. § 3664(f) provides that:

> (3)(A) A restitution order may direct the defendant to make a single, lump-sum payment, partial payments at specified intervals, in-kind payments, or a combination of payments at specified intervals and in-kind payments.
>
> . . .
>
> (4) An in-kind payment described in paragraph (3) may be in the form of -- (A) return of property; (B) replacement of property; or (C) <u>if the victim agrees, services rendered to the victim</u> or a person or organization other than the victim.

-31-

(emphasis added).

The government asserts that "the district court has the authority to order Raheman to perform services [i.e., return the children] directly to the victim . . ., so long as the victim consents." In so doing, the government makes no attempt to equate the mandates of the district court's forthwith order -- to "forthwith take all reasonable measures within his control to return the children to the United States" -- with the "in-kind payments" contemplated by Congress in 18 U.S.C. § 3664(f)(3)(A), (4). Indeed, at oral argument, the government conceded that it was unable to find any case law wherein the imposition of a similar condition was affirmed on the basis of the restitution statutes.

We, too, have found nothing in the case law or legislative history that characterizes children either as traditional restitution or as in-kind payments. In our view, this void is neither astonishing nor deserving of extensive elaboration. Children are not "property" nor is their transfer a "service," and we decline the invitation to hold otherwise.

**(2) All Writs Act**

In a final attempt to salvage the order, the government asserts that, "to the extent that this Court concludes that the district court was not specifically authorized to issue a forthwith order pursuant to 18 U.S.C. § 3664(f)(4), the district court

properly relied upon its general authority under the All Writs Act, 28 U.S.C. § 1651(a)."  We disagree.

Under the All Writs Act, Congress authorized federal courts to "issue all writs necessary or appropriate in aid of <u>their</u> respective jurisdictions and agreeable to the usages and principles of law."  28 U.S.C. § 1651(a) (emphasis added).  The word "their," of course, refers to the federal courts -- and not, for example, to state family courts.  Here, the district court had criminal jurisdiction over Raheman, <u>see</u> 18 U.S.C. § 3231, but did not have jurisdiction over the custody of the children.  So understood, we conclude that the forthwith order went too far.

As the law now stands, the forthwith order "to return the children to the United States" was not a necessary concomitant of an appropriate penalty in this case;[14] instead, it served, at least in part, as a mechanism through which the Middlesex Probate Court could effectuate its own jurisdiction over the custody of the children.  Indeed, the order itself expresses such a purpose.[15]  For these reasons, then, the district court's order was neither "necessary" nor "appropriate" to effectuate -- or otherwise aid in

---

[14]Had Congress intended it to be one, it easily could have so provided.

[15]"The Defendant shall forthwith take all reasonable measures within his control to return the children to the United States <u>so that the Middlesex Probate Court</u> (or other appropriate court) may determine child custody issues . . . ." (emphasis added).

-33-

-- its own jurisdiction, and there accordingly was no basis for the invocation of the All Writs Act.

**(3) Disposition**

Having discerned no authority for the imposition of this forthwith order, it must be vacated. We note, however, that if an order to return the children were, as originally contemplated, imposed as a condition of supervised release, it would appear to be lawful and appropriate. See Amer, 110 F.3d at 882-83 ("The 'return' condition [of supervised release] is obviously closely related to the nature and circumstances of the offense of child abduction and the history and characteristics of [the defendant]. Indeed, it is difficult to imagine a condition more closely tailored to the crime and the criminal in question than this one." (internal quotation marks omitted and emphasis added)). We are mindful of the government's concern that such a condition (as opposed to a parallel forthwith order) might leave the mother -- and, perhaps, the children -- without an adequate remedy. If this indeed is the case, the government might do well to petition Congress for a solution rather than inviting this court to invent one.

In view of the district court's obvious intent and the uncertainty accompanying whether the "return-the-children" directive should (or should not) be construed as a condition of supervised release, we believe that the ends of justice require us to remand

for resentencing so that the court may, in light of this opinion, reconsider the status and wording of this condition.

## F.  **Ineffective Assistance of Counsel**

Finally, Raheman argues that, because he had "important testimony to give regarding the kidnapping charge and a strong need to refrain from testifying on the wiretapping charge," trial counsel was ineffective because he made no motion to sever the charges.  On this basis, Raheman invites us to "vacate the convictions and remand the matter for two separate trials on each charge . . . ."

We decline the invitation.  This circuit has held "with a regularity bordering on the monotonous that fact-specific claims of ineffective assistance cannot make their debut on direct appeal of criminal convictions, but, rather, must originally be presented to, and acted upon by, the trial court."  United States v. Mala, 7 F.3d 1058, 1063 (1st Cir. 1993) (collecting cases).  Absent the rare occasion where, on direct appeal, the record is sufficiently clear to allow reasoned consideration of the ineffective-assistance claim, see, e.g., United States v. Natanel, 938 F.2d 302, 309 (1st Cir. 1991), "[t]he preferable vehicle for such [a] claim[] is a collateral proceeding under 28 U.S.C. § 2255, in which the parties and the district court can address factual matters relevant to the issue."  United States v. Genao, 281 F.3d 305, 313 (1st Cir. 2002) (citation omitted).

Here, for reasons we need not elaborate upon, the record is insufficiently developed to allow for meaningful review on direct appeal. Accordingly, Raheman must pursue his claim in the traditional fashion.[16]

## III.

For the reasons stated above, we **affirm** the convictions, **vacate** the forthwith order, and **remand** for resentencing for the imposition of any conditions of supervised release that the district court may deem appropriate in light of this opinion.

**It is so ordered.**

---

[16]Indeed, Raheman has already filed a § 2255 motion in the district court, alleging, <u>inter alia</u>, that trial counsel was ineffective. In an order dated January 22, 2003, the district court agreed to hear Raheman's collateral claims simultaneously with this court's consideration of the direct appeal. (The district court explained its ruling as follows: "[T]here are extraordinary circumstances here because of the immediate concerns about the custody of the children, which have not yet been resolved by the courts in India. As long as the federal claims are not fully resolved, proceedings in India may be delayed.").

Raheman's assertion to the contrary notwithstanding, it is of no import that the § 2255 motion was filed <u>pro se</u>. See <u>Ellis</u> v. <u>United States</u>, 313 F.3d 636, 652 (1st Cir. 2002) ("A convicted criminal has no constitutional right to counsel with respect to habeas proceedings.").