**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Cole Cameron CUMMINGS, aka
Coleman Cameron Cummings,
Defendant–Appellant.**

**No. 01–30032.**

United States Court of Appeals,
Ninth Circuit.

Argued Dec. 3, 2001.

Submitted Feb. 14, 2002

Filed Feb. 27, 2002.

Stephen R. Hormel, Federal Defenders of Eastern Washington and Idaho, Spokane, WA, for the defendant-appellant.

Francis J. Diskin, U.S. Attorney, Timothy J. Ohms, Assistant U.S. Attorney for the Eastern District of Washington; Marc I. Osborne (argued), U.S. Department of Justice, Washington, D.C., for the plaintiff-appellee.

Before: O'SCANNLAIN, GRABER, and McKEOWN, Circuit Judges.

O'SCANNLAIN, Circuit Judge.

We must decide whether the International Parental Kidnapping Crime Act, which criminalizes the retention of a kidnapped child in a foreign country, is unconstitutional.

I

Cole Cameron Cummings married Dana Hopkins in 1989, and they had three children, all of whom were born in the United States and resided with their parents in the State of Washington. In 1995, Cummings and Hopkins divorced, and a Washington state court ordered the children to reside primarily with Hopkins. Cummings thereafter married a German citizen and, together with his new wife, exercised his visitation rights with the children while still residing in Washington. In August 1997, the new Mrs. Cummings left Washington for the Federal Republic of Germany to work.

In November 1997, the oldest child ("child # 1") was placed in Cummings's temporary custody after being struck in

the face by his stepfather, Hopkins's new husband. Washington State Child Protective Services received complaints that the remaining children were abused in the Hopkins home. Believing that his other two children were at risk of physical abuse, in March 1998 Cummings picked up his second oldest child ("child # 2") for a weekend visitation. Instead, he removed both child # 1 and child # 2 from the United States via commercial airline to Germany, where both children remain today. A German court denied Hopkins's petition made pursuant to the Hague Convention on the Civil Aspects of International Parental Child Abduction ("the Convention") to return the children to Washington. Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, arts. 8–20. She also filed a civil contempt action against Cummings in Washington state court.

Subsequently, the United States indicted Cummings under the International Parental Kidnapping Crime Act ("IPKCA"), 18 U.S.C. § 1204(a), for four counts of kidnapping. Counts 1 and 3 alleged the *removal* of a child outside the United States contrary to the parental rights of the child's mother. Counts 2 and 4 alleged the *retention* of a child outside the United States contrary to the parental rights of the mother. Cummings entered a conditional guilty plea to counts 2 and 4 (counts 1 and 3 were dismissed as part of the agreement), but he preserved his right to appeal the district court's denial of his motion to dismiss the indictment.

The district court sentenced Cummings to six months in prison and one year of supervised release, as well as a $200 special assessment, and entered an order requiring Cummings to pay Hopkins $15,090.82 in restitution. Of that amount, $14,085.50 was for Hopkins's attorney's fees in the separate state and international civil proceedings to recover custody of her two children. Cummings timely appeals the conviction and the attorney's fees portion of the restitution order.

II

Cummings argues that Congress did not have authority under the Commerce Clause to criminalize the *retention* of an American child in a foreign country; his appeal does not challenge Congress's authority to criminalize *removal.* The Commerce Clause gives Congress the power to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. 1, § 8, cl. 3. "This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution." *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 196, 6 L.Ed. 23 (1824).

Congress's Commerce Clause authority is broad enough to stretch beyond the simple regulation of commercial goods traveling in interstate and foreign commerce to include regulation of non-economic activities—such as racial discrimination or growing wheat for personal consumption—that affect, impede, or utilize the channels of commerce. *See, e.g., Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 253, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) (upholding Title II of the Civil Rights Act because racial discrimination "impede[d] interstate travel" through the channels of commerce); *Wickard v. Filburn,* 317 U.S. 111, 128–29, 63 S.Ct. 82, 87 L.Ed. 122 (1942) (upholding government's fine of a farmer for growing wheat for personal consumption in excess of his set quota because Congress sought to control wheat shortages and surpluses).

■ Thus, so long as § 1204(a) falls into one of the delineated "categories of activity that Congress may regulate under its commerce power," its reach need not be confined to commercial goods to be constitutional. *United States v. Lopez*, 514 U.S. 549, 558, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). The Supreme Court has identified three such categories: (1) regulating the use of the channels of commerce; (2) regulating and protecting the instrumentalities of commerce or persons in interstate commerce, even though the threat may come only from intrastate activities; and (3) regulating activities that have a substantial effect on commerce. *Id.* at 558–59, 115 S.Ct. 1624.[1]

### A

The district court held that 18 U.S.C. § 1204(a) fell within Congress's ability to regulate the channels of commerce (*Lopez's* first category). Specifically, the statute criminalizes the actions of one who "removes a child from the United States or retains a child (who has been in the United States) outside the United States with intent to obstruct the lawful exercise of parental rights." 18 U.S.C. § 1204(a). By its terms, a child retained in a foreign country has to have been taken *from* the United States to another country if § 1204(a) is to apply. Cummings could not wrongfully retain his children in Germany without traveling there by some means of foreign commerce.

Congress's power to regulate the use of the channels of commerce is well-established.[2] In *United States v. Darby*, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941), the Court upheld congressional authority to prohibit the interstate transportation of goods that were produced "under substandard [wage and hour] labor conditions." *Id.* at 115, 61 S.Ct. 451. In *Caminetti v. United States*, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917), the Court upheld Congress's ability to criminalize interstate trafficking of women for immoral purposes:

> The transportation of passengers in interstate commerce, it has long been settled, is within the regulatory power of Congress, under the commerce clause of the Constitution, and the authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question.

*Id.* at 491, 37 S.Ct. 192. Here, the wrongfully-removed children traveled in the channels of foreign commerce to reach Germany, where they were wrongfully retained.

Cummings argues that these principles do not speak to the constitutionality of the retention portion of § 1204(a) because they target conduct directly involved in the movement of people or things in commerce. He argues that once the move-

---

**1.** Although *Lopez* dealt with interstate commerce, we apply its analytical framework in the foreign commerce area as well, where Congress has broader power. The fact that this case arises in the context of foreign commerce is quite relevant to our inquiry. *See Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 448, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979) ("Foreign commerce is preeminently a matter of national concern[,]" and "there is evidence that the Founders intended the scope of the foreign commerce power to be

... greater" than the scope of the interstate commerce power.).

**2.** The government argues that we could find § 1204(a) a valid exercise of Congress's commerce power under any of *Lopez's* three categories of appropriate areas to regulate. Because we uphold § 1204(a) as a valid regulation of the use of the channels of foreign commerce, we do not analyze the statute under the second or third *Lopez* category.

ment ceases, the channels of commerce are no longer affected. Here, of course, § 1204(a) targets activity (i.e., retention) *after* movement has ceased.

■ We are unpersuaded. The cessation of movement does not preclude Congress's reach if the person or goods traveled in the channels of foreign commerce. In *United States v. Rambo*, 74 F.3d 948 (9th Cir.1996), we upheld 18 U.S.C. § 922(*o*)'s prohibition on machinegun possession because the statute was " 'an attempt to prohibit the interstate transportation of a commodity through the channels of commerce.' " *Id.* at 952 (quoting *Lopez*, 514 U.S. at 559, 115 S.Ct. 1624). Section 922(*o*) permissibly proscribes possession *after* the items' movement through the channels of commerce ceases because, we noted, "there [could] be 'no unlawful possession under section 922(*o*) without an unlawful transfer.' " *Id.* (quoting *United States v. Kirk*, 70 F.3d 791, 796 (5th Cir. 1995)). We concluded that "[b]y regulating the market in machineguns, including regulating intrastate machinegun possession, Congress has effectively regulated the interstate trafficking in machineguns." *Id.*

■ Likewise, § 1204(a) reaches conduct once the unlawful foreign transportation has ended. *See also United States v. Jones*, 231 F.3d 508, 514–15 (9th Cir.2000) (upholding a federal statute that prohibited felons from possessing firearms that were previously shipped in or otherwise affected commerce). We are satisfied that Congress can act to prohibit the transportation of specified classes of persons in foreign commerce and thus proscribe conduct such as retention of those persons, even though transportation is complete.

## B

Not only does § 1204(a) target activity after the use of channels of foreign commerce is complete, but it also removes an impediment to the use of those channels. If a child is wrongfully retained in a foreign country, he or she cannot freely use the channels of commerce to return. Congress has authority to prevent individuals from impeding commerce, *see Heart of Atlanta Motel*, 379 U.S. at 253, 85 S.Ct. 348; *United States v. Green*, 350 U.S. 415, 416–17, 76 S.Ct. 522, 100 L.Ed. 494 (1956) (upholding Hobbs Act, which made it a crime to "obstruct[ ], delay[ ], or affect[ ] commerce or the movement of any article or commodity in commerce, by robbery or extortion"); *United States v. Mussari*, 95 F.3d 787, 790 (9th Cir.1996) ("The frustration of satisfaction of the obligation [to pay child support] … is an impediment to interstate commerce that Congress can criminalize as it has criminalized other impediments to interstate commerce."), and, as to those who "retain"[3] children outside the United States, to prevent them from traveling back to this country via the channels of commerce. Thus, by wrongfully retaining his children in Germany, Cummings is interfering with the use of the channels of foreign commerce; IPKCA removes an impediment to travel and makes possible unrestricted use of the channels of commerce.

Cummings argues that the retention element of IPKCA is different because it targets neither economic activities nor the intentional prevention of economic activities. Rather, he argues that it targets interference with the individual rights of a parent, conduct traditionally left to the States to regulate. *See United States v. Morrison*, 529 U.S. 598, 613, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000); *but see*

---

**3.** Webster's Dictionary defines "retain" to mean "to hold back, keep, restrain." MER-RIAM WEBSTER'S COLLEGIATE DICTIONARY 999 (10th ed.1996).

*Mussari*, 95 F.3d at 790 (rejecting challenge to a federal statute criminalizing non-payment of child support because it was a "regulation of a fundamental familial relation"). First, we disagree that Congress cannot target non-economic activities that nevertheless impede the use of the channels of commerce. Like *Heart of Atlanta Motel*, which upheld the removal of a non-economic impediment to interstate travel (racial discrimination), IPKCA removes a non-economic impediment to foreign travel (wrongful retention in a foreign country). Second, while we recognize that issues of family law are usually matters for the States, IPKCA deals first and foremost with international kidnapping, which is an area not traditionally reserved to the States. We therefore reject Cummings's argument that § 1204(a) trammels the States' authority.

C

Furthermore, although not necessarily required, we note that IPKCA inherently contains a jurisdictional element that ensures that the wrongfully retained children passed through the channels of foreign commerce. Indeed, the *Lopez* statute's fatal flaw was that it contained "no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affect[ed] interstate commerce." 514 U.S. at 561, 115 S.Ct. 1624. In *Jones*, we upheld a federal statute that prohibited felons from possessing firearms because it applied only to firearms previously shipped in or otherwise affecting commerce. The jurisdictional element " 'insures, on a case-by-case basis, that a defendant's actions implicate interstate commerce to a constitutionally adequate degree.' " *Jones*, 231 F.3d at 514 (quoting *United States v. Polanco*, 93 F.3d 555, 563 (9th Cir.1996)).

Likewise, IPKCA bans the retention of "a child (who has been in the United States) outside the United States." 18 U.S.C. § 1204(a). The parenthetical clause ensures that prosecution under the statute occurs only if the child has first been moved *from* the United States *to* another country. Here, Cummings boarded an airplane in the United States with his two children and flew to Germany. This movement constitutes use of the channels of foreign commerce and thus provides the jurisdictional element lacking in *Lopez*.

We recognize that § 1204(a) does not *expressly* require movement in commerce with the intent to retain a child in violation of parental rights. Nor does it expressly require retention of the child with the intent to prevent travel in commerce back to the United States. The statute at issue in *Jones* explicitly made it unlawful for certain people to "possess in or affecting interstate commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(8). IPKCA is not so specific, but its prohibition of the retention of "a child (who has been in the United States) outside the United States," implicitly and unavoidably requires movement in foreign commerce. Indeed, the crime, by its very terms, involves the use of the channels of commerce. We therefore hold that IPKCA was validly enacted within Congress's authority under the Commerce Clause, and we affirm Cummings's conviction.

III

Cummings also challenges the district court's restitution order requiring him to pay Hopkins's attorney's fees of $14,085.50 incurred in a related state court civil contempt proceeding and her petition under

the Hague Convention to recover custody of her wrongfully removed and retained children. He argues that the district court hearing his federal criminal prosecution lacked the authority to order restitution for attorney's fees arising from separate state and international civil proceedings.

## A

The Victim and Witness Protection Act of 1982 ("VWPA") authorizes a district court to sentence a defendant to pay restitution to a victim of his offense. 18 U.S.C. § 3663(a)(1)(A). The Act was designed "to ensure that the Federal Government does all that is possible within limits of available resources to assist victims and witnesses of crime without infringing on the constitutional rights of the defendant." Pub.L. 97–291, § 2(b)(2), 96 Stat. 1248 (1982). Cummings does not deny that Hopkins qualifies as a victim under the statute.[4] The VWPA provides that a district court may order reimbursement of "expenses related to participation in the investigation or prosecution of the offense." 18 U.S.C. § 3663(b)(4). Hopkins's attorney's fees are expenses related to the government's investigation and prosecution of Cummings for wrongfully retaining his children in a foreign country, thereby interfering with their mother's parental rights.

 To survive scrutiny, there must be a close connection between the restitution ordered and the injury sustained from the criminal behavior. " 'Restitution can only include losses directly resulting from a defendant's offense' " and, therefore, " 'a restitution order must be based on losses directly resulting from the defendant's criminal conduct.' " *United States v. Stoddard,* 150 F.3d 1140, 1147 (9th Cir.1998) (quoting *United States v. Sablan,* 92 F.3d

865, 870 (9th Cir.1996)); *see also United States v. Akbani,* 151 F.3d 774, 779–80 (8th Cir.1998) (upholding restitution of legal fees incurred by a bank to recover its losses from defendant's check-kiting scheme in separate civil proceedings). Here, Hopkins's attorney's fees, which were incurred in an attempt to regain custody of her children, were a direct and foreseeable result of Cummings's improper removal and retention of them. There would have been no need to engage in civil proceedings to recover the children if Cummings had not unlawfully taken them to Germany.

Indeed, IPKCA itself specifies that procedures under the Convention "should be the *option of first choice* for a parent who seeks the return of a child who has been removed from the parent" because "the use of the procedures under the Hague Convention ... has resulted in the return of many children." Pub.L. 103–173, § 2(b), 107 Stat.1998 (1999) (emphasis added). The Convention also specifies that a signatory country, before ordering the return of the kidnapped child, may "request that the applicant obtain from the authorities of the State of the habitual residence of the child a decision or other determination that the removal or retention was wrongful." Convention on the Civil Aspects of International Child 3217 Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, art. 15. Thus, Hopkins followed the statutorily favored procedures established to regain custody of her children—she first sought relief in state court and under the Convention, and that relief was closely tied to this criminal prosecution.

## B

 Cummings argues that *United States v. Barany,* 884 F.2d 1255 (9th Cir.

---

**4.** A victim is a person "directly and proximately harmed" by the offense. 18 U.S.C.

§ 3663(a)(2).

1989), demonstrates that the district court exceeded its authority by ordering restitution for expenses incurred in separate proceedings. In *Barany*, the defendant was convicted of defrauding insurance companies through filing fraudulent claims. *Id.* at 1257. Before being indicted, the defendant had filed a civil action against one of the insurance companies for breach of contract and bad faith in delaying action on her claim, which was fraudulent. *Id.* The district court ordered defendant to pay restitution to the insurance company for its expenses incurred defending the civil action, but we reversed, holding that "the amount of resources [the insurance company] chose to expend in defending the civil suit [was] only *tangentially related* to the defendant's original offenses." *Id.* at 1261 (emphasis added). Furthermore, we held that "the district court in the criminal case[was] clearly without authority to award attorney's fees in a *wholly separate civil suit* still pending in a state court." *Id.* (emphasis added).

Unlike *Barany*, here we cannot say that the civil suits in which Hopkins incurred attorney's fees are "wholly separate" from the government's prosecution of Cummings.[5] Indeed, Hopkins duly followed the preferred steps to retrieve her children. The civil proceedings were therefore not "wholly separate," but rather expressly stated as integral threshold avenues to regain one's children. Additionally, we note that *Barany* predated § 3663(b)(4), which was enacted in 1994 and added new provisions meant to broaden the opportunity for victims' recovery. Finally, unlike the insurance company in *Barany*, a parent deprived of her children does not have the same choices about what sums are appropriately spent to rectify the harm done.

We are satisfied that the 1994 revisions to the VWPA that expanded the opportunity for victims to recover their losses and the unique aspect of this crime combine to distinguish the case before us from *Barany* and our sister circuits' precedents that might suggest that restitution is inappropriate.[6]

Finally, we note that the Grenberg Municipal Court that heard Hopkins's Convention petition did not order payment of either party's costs. Nor has the Washington State Superior Court in which Hopkins brought her contempt action issued a final order regarding her attorney's fees. Therefore, the district court's order of restitution was not duplicative, and we affirm.

## IV

The district court properly held that 18 U.S.C. § 1204(a) is constitutional as a valid exercise of Congress's Commerce Clause

---

**5.** It is also of interest that Cummings and the government agreed to recommend that Cummings serve only a probationary sentence for violating IPKCA because he had already been incarcerated for civil contempt in Hopkins's state civil action. Having himself claimed that his civil incarceration should mitigate the applicable criminal penalty, we find less persuasive Cummings's claim that the state civil proceeding was wholly unrelated to the government's criminal prosecution of him.

**6.** *See Gov't of the Virgin Islands v. Davis*, 43 F.3d 41, 46 (3d Cir.1994) ("[E]xpenses generated in order to recover ... property are not part of the value of the property lost ..., and are, therefore, too far removed from the underlying criminal conduct to form the basis of a restitution order."); *United States v. Mullins*, 971 F.2d 1138, 1147 (4th Cir.1992) ("We hold that an award of restitution under the VWPA cannot include consequential damages such as attorney's ... fees expended to recover the property."); *United States v. Arvanitis*, 902 F.2d 489, 497 (7th Cir.1990) (holding that restitution for consequential damages, such as legal fees expended to investigate a fraudulent insurance claim, are not available under the VWPA).

authority, and it did not err in ordering Cummings to pay restitution for attorney's fees incurred in the related civil proceedings.

**AFFIRMED.**