**UNITED STATES of America,
Plaintiff,**

**v.**

**Brian Karl BRIMAGER, Defendant.**

**Case No. 13cr2381 JM.**

United States District Court,
S.D. California.

Signed Aug. 18, 2015.

Shane P. Harrigan, W. Mark Conover, U.S. Attorney's Office, San Diego, CA, for Plaintiff.

C. Bradley Patton, Sanders B. Patton, Law Office C. Bradley Patton APC, Carlsbad, CA, Devin Jai Burstein, Jeremy D. Warren, Warren & Burstein, San Diego, CA, for Defendant.

## ORDER DENYING MOTIONS TO DISMISS THE FOREIGN MURDER CHARGE

JEFFREY T. MILLER, District Judge.

Defendant is charged, in count one of a second superseding indictment, with first degree foreign murder of a United States national, in violation of 18 U.S.C. § 1119. He has filed two motions to dismiss the murder charge. The first motion, (Doc. No. 91), asserts that § 1119 has been improperly and unconstitutionally charged because, in essence, Panama has "the ability" to secure his return within the meaning of § 1119(c)(2), which disqualifies the United States from prosecuting him in this case. The second motion, (Doc. No. 92), is based upon the argument that " § 1119 is beyond Congressional authority." Both motions were fully briefed, and a hearing was held on August 10, 2015. For the reasons set forth below, both motions are denied.

## BACKGROUND

According to the government, Defendant flew to Panama with Yvonne Baldelli in late September 2011. Two months later, in late November, he allegedly killed her, dismembered and disposed of her body in a remote jungle area, and undertook to cover up her disappearance. Among other things, the government alleges that Defendant used Baldelli's e-mail and bank accounts from outside the country to make it appear that she was still alive. Defendant and Baldelli were both United States citizens.

In June 2013, Defendant was charged with obstruction of justice and making false statements to a federal officer. (Doc. No. 1.) That indictment was followed by a first superseding indictment in January 2014. (Doc. No. 28.)

After further investigation, the government requested authorization from the Attorney General to prosecute Defendant for foreign murder under 18 U.S.C. § 1119. Section 1119(c) provides that the government can prosecute a person who is a United States national for foreign murder only after receiving written approval from the Attorney General, Deputy Attorney General, or an Assistant Attorney General, who must have consulted with the Secretary of State and determined that the conduct took place in a country in which the accused is no longer present and that the

country lacks the ability to lawfully secure his return.

On March 18, 2015, Assistant Attorney General Leslie R. Caldwell provided written authorization to prosecute Defendant for Baldelli's murder:

> I hereby approve prosecution of Brian Karl Brimager under 18 U.S.C. § 1119 for the killing of Yvonne Baldelli. You may, in your discretion, prosecute Brimager for first degree or second degree murder, or for manslaughter. Prior to approving prosecution, I have made the determinations required by subsection (c)(2) of the statute in consultation with the State Department Acting Legal Adviser, pursuant to the delegations of the Attorney General and the Secretary of State.

(Doc. No. 95, App.A.) On April 17, 2015, the government filed the operative second superseding indictment, charging Defendant with first degree foreign murder, in addition to the earlier charges. (Doc. No. 80.)

## DISCUSSION

■ The foreign murder statute, 18 U.S.C. § 1119, makes it a crime for one United States national to kill another United States national in a foreign country. In a subsection captioned "Offense," it defines the crime as follows:

> A person who, being a national of the United States, kills or attempts to kill a national of the United States while such national is outside the United States but within the jurisdiction of another country shall be punished as provided under sections 1111, 1112, and 1113.[1]

*Id.* § 1119(b).

The next subsection, captioned "Limitations on Prosecution," provides:

> (1) No prosecution may be instituted against any person under this section except upon the written approval of the Attorney General, the Deputy Attorney General, or an Assistant Attorney General, which function of approving prosecutions may not be delegated. No prosecution shall be approved if prosecution has been previously undertaken by a foreign country for the same conduct.
> (2) No prosecution shall be approved under this section unless the Attorney General, in consultation with the Secretary of State, determines that the conduct took place in a country in which the person is no longer present, and the country lacks the ability to lawfully secure the person's return. A determination by the Attorney General under this paragraph is not subject to judicial review.

*Id.* § 1119(c)(1)-(2).

Defendant contends that the murder charge must be dismissed, and he seeks an order requiring the government to produce its communications regarding the decision to charge him. The court addresses each of his substantive motions in turn, beginning with the motion based on the argument that § 1119 was unconstitutionally enacted. The court will then analyze Defendant's claim that the government has violated § 1119(c)(2) by proceeding with the murder charge.

---

1. Section 1111 defines first and second degree murder and prescribes the relevant punishments as death or imprisonment for life for first degree murder, or imprisonment for any term of years or life for second degree murder. *See* 18 U.S.C. § 1111(a)-(b). Section 1112 defines voluntary and involuntary manslaughter and prescribes terms of imprisonment for each of them. *See id.* § 1112(a)-(b). Section 1113 prescribes penalties for attempted murder and manslaughter. *See id.* § 1113.

## A. Congressional Authority to Enact § 1119

Defendant contends that § 1119 is invalid because Congress did not have the power to enact it. He points out that the Constitution gives Congress express authority to enact criminal laws in only a handful of areas—counterfeiting, piracy and felonies committed on the high seas, offenses against the law of nations, and treason. *See* U.S. Const. art. I, § 8, art. III, § 3. He argues that § 1119 does not fall into any of these enumerated categories and is not authorized by any of Congress's other express powers. In broad strokes, he asserts that there was no constitutional foundation for Congress to enact this statute as part of the Violent Crime Control and Law Enforcement Act of 1994, in that § 1119 is not tethered to foreign commerce or treaty considerations, and it is not predicated upon the Necessary and Proper Clause. It follows, Defendant asserts, that § 1119 can only be an exercise of general police power, which Congress does not have.

The government responds that Congress indeed possessed constitutional authority to enact § 1119 under its broad authority over external affairs and under the Foreign Commerce Clause and the cases interpreting these powers. Defendant, in turn, contends that the government's arguments focus more upon the extraterritorial reach of the statute—a proposition not disputed by Defendant—rather than the constitutional validity of its enactment.

Defendant's constitutional challenge to § 1119 is facial, which is the most difficult challenge to mount successfully. *See United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). To succeed, he must establish that "no set of circumstances exists under which the Act would be valid." *Id.* "Due respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." *United States v. Morrison,* 529 U.S. 598, 607, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000).

While it cannot be gainsaid that Congress possesses no plenary police power by which every type of legislation could be enacted, the principle of enumerated powers "presupposes something not enumerated." *United States v. Lopez,* 514 U.S. 549, 566, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (internal quotation marks omitted). As Chief Justice Marshall wisely predicted, the extent of those granted powers will continue to be questioned "so long as our system shall exist." *McCulloch v. Maryland,* 4 Wheat. 316, 405, 4 L.Ed. 579 (1819).

### 1. Congress's Implied Foreign Powers

The government proposes Congress's implied foreign powers as a constitutional basis for the enactment of § 1119, which in turn are predicated upon the nation's sovereignty and its power to assert jurisdiction over its own citizens. The government cites *United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936), for the general principles articulated by the Supreme Court buttressing the federal government's powers in external affairs:

> The broad statement that the federal government can exercise no powers except those specifically enumerated in the Constitution, and such implied powers as are necessary and proper to carry into effect the enumerated powers, is categorically true only in respect of our internal affairs. In that field, the primary purpose of the Constitution was to carve from the general mass of legislative powers *then possessed by the states* such portions as it was thought desirable to

vest in the federal government, leaving those not included in the enumeration still in the states. That this doctrine applies only to powers which the states had is self-evident. And since the states severally never possessed international powers, such powers could not have been carved from the mass of state powers but obviously were transmitted to the United States from some other source.

*Id.* at 315–16, 57 S.Ct. 216 (citation omitted). That other source, the Court explains later, is the nation's external sovereignty, which does not depend on affirmative grants of the Constitution and instead is "governed by treaties, international understandings and compacts, and the principles of international law." *Id.* at 318, 57 S.Ct. 216.

In *United States v. King,* 552 F.2d 833 (9th Cir.1976), the Ninth Circuit held that Congress can exercise external jurisdiction to the full extent allowed by international law. In *King,* the defendants had been convicted of distributing heroin in Japan intended for importation into the United States. *See id.* at 850. They argued that the reach of the statute they were convicted under, which was expressly aimed at extraterritorial conduct (the manufacture or distribution of a controlled substance for the purpose of importation into the United States), exceeded the power vested in Congress by the Constitution. *See id.*

The Ninth Circuit rejected their argument. It began by observing, "There is no constitutional bar to the extraterritorial application of penal laws. Numerous decisions have upheld the authority of the United States to enact and enforce criminal laws with extraterritorial effect." *Id.* (citation omitted). "From the body of international law, the Congress may pick and choose whatever recognized principle of international jurisdiction is necessary to accomplish the purpose sought by the legislation." *Id.* at 851. The five recognized principles of international jurisdiction, the court explained, are the territorial principle, which allows nations to punish acts that produce detrimental effects within their borders; the nationality principle, which is based on the nationality of the accused; the protective principle, which authorizes nations to protect their interests and integrity; the universality principle, which confers jurisdiction to punish offenses against the law of nations; and the passive personality principle, which is based on the nationality of the victim. *See id.; United States v. Layton,* 509 F.Supp. 212, 215–16 (N.D.Cal.1981) (describing the five principles more fully).

Based on two of these principles, the nationality principle and the territorial principle, the Ninth Circuit held that Congress had the power to punish the foreign distribution of drugs destined for America because the defendants were United States citizens and their activity was intended to, and did, have adverse effects in the United States. *See King,* 552 F.2d at 851–52.

The case of *United States v. White,* 51 F.Supp.2d 1008 (E.D.Cal.1997), relied on these cases to hold that Congress had the power to enact § 1119, the statute at issue here. The defendant, who was accused of killing her son in Japan, argued that Congress's enumerated powers did not give it authority to enact § 1119. *See id.* at 1010–11. The court relied on *Curtiss–Wright, King,* and another case, *United States v. Juda,* 46 F.3d 961 (9th Cir.1995), which had held that, "[u]nder international law, a nation may generally assert jurisdiction over its citizens." *Id.* at 967. The court concluded: "It is pellucid Congress possesses external sovereignty authority to pass criminal laws proscribing its nationals' outlaw conduct against other nationals abroad." *White,* 51 F.Supp.2d at 1011.

Under the approach suggested by these cases, Congress indeed had the power to enact § 1119 and extend its reach under the territorial and nationality principles, if not others, because § 1119 makes it a crime for one American to kill another American overseas.

Defendant dismisses these cases, arguing that *Curtiss–Wright* was about delegation of powers, not Congress's power to enact extraterritorial penal laws, and *King* and the cases like it are about the permissible reach of Congress's laws, not its power to enact them in the first place. Moreover, he argues, *White* must be wrong because its approach leaves Congress dangerously unchecked, free to criminalize such trivialities as jaywalking or littering abroad, or perhaps speaking with a foreigner, the classic "slippery slope" refrain.

Defendant's doubts are misplaced. While the language in *Curtiss–Wright* is general and does not amount to a holding, the logic of *King* and similar cases is relevant and compelling. Yes, *King, United States v. Clark*, 435 F.3d 1100 (9th Cir. 2006), and other cases discuss the concept of extraterritoriality. But the constitutional underpinnings for the respective statutes under scrutiny were also addressed. For example, in *King*, the court observes, "Numerous decisions have upheld the authority of the United States to *enact* and enforce criminal laws with extraterritorial effect." 552 F.2d at 850 (emphasis added) (citing cases). Both parties in *King*, as well as Defendant in this case, accepted "the same five principles of extraterritorial authority generally recognized under international law," *id.* at 851, including the territorial, nationality, protective, and passive personality principles, all advanced by the government as relevant here. *King* and the other cases utilize the extraterritorial principles not only to justify the "reach" of a statute, but also for the underlying rationale buttressing the constitutionality of its enactment.

In *King*, the court observed that "[s]ince both [drug conspirators operating in Japan were] United States citizens, the nationality principle would apply: American authority over them could be based upon the allegiance they owe this country and its laws if the statute . . . evinces a legislative intent to control actions . . . [outside] the United States." *Id.* at 851. The statute in *King* was applied to a foreign drug conspiracy and upheld on the basis of the district court's application of the nationality principle. Here, § 1119 expressly and exclusively applies to the *foreign* murder of one American by another American. Nothing could more clearly evince Congress's intent to apply the nationality principle as a constitutional foundation for the statute.

*King* also sanctioned the territorial principle as justification for the prosecution of the American drug conspirators operating in Japan:

> Since appellants' activity in Japan was intended to, and did, have an actual adverse impact in the United States—the further distribution of the heroin here—they can be held subject to American law as if they had acted within American territory.
>
> We conclude that the jurisdictional reach of § 959 is properly within the scope of Congress's legislative power and that the statute is constitutional as applied to appellants.

*Id.* at 852.

Extrapolating from *King*, it is clear that the territorial principle applies with equal force here. Defendant is charged with the murder of Yvonne Baldelli which, if true, was an intentional act with actual adverse consequences in the United States, *i.e.*, the substantial damage, loss, and harm sustained by the victim's family, friends, and

community. It is also clear that the *King* court, rejecting an "as applied" constitutional attack on § 959, would certainly have rejected a "facial" attack on the statute.

A fair reading of *King* is susceptible of only one conclusion: utilizing the nationality principle or the territorial principle, § 949 was constitutionally applied in the prosecution of two United States citizens for their drug conspiracy activity in Japan. Either of those two principles was sufficient for the extraterritorial authority in *King. See Chua Han Mow v. United States,* 730 F.2d 1308, 1312 (9th Cir.1984) ("Extraterritorial application of penal laws may be justified under any one of the five principles of extraterritorial authority.").

Similarly, § 1119 in this case may be justified by either the national or territorial principles that provide not only territorial reach but underlying constitutional validity to the statute. For Defendant to use the "slippery slope" argument of an unchecked Congress running amok to criminalize foreign littering or jaywalking by an American misses the point in light of Defendant's *facial* challenge to § 1119. Because the foreign murder statute exclusively criminalizes foreign murder, and not trivial offenses, it is soundly predicated on the national and territorial principles and would always be immune to a facial challenge.

The fundamental difficulty for Defendant is that he has not met his burden of showing that § 1119 is plainly and facially unconstitutional. His argument that Congress's external powers must be tethered to enumerated powers or limited in the ways he claims is historically inaccurate and unsupported by legal analysis.

Defendant's arguments are clearly at odds with *United States v. Clark,* 435 F.3d 1100 (9th Cir.2006). In *Clark,* the defendant was convicted of traveling in "foreign commerce," *i.e.,* to a foreign country, to

engage in a sexual act with a person under 18 years of age, in violation of 18 U.S.C. § 2423(c), a part of the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today ("PROTECT") Act. While holding that Congress properly utilized the Foreign Commerce Clause as constitutional authority for the enactment of § 2423(c), the court also observed that "expansive latitude" has been given to Congress over foreign commerce, and in a manner less restrained by power to regulate domestic commerce. *Clark,* 435 F.3d at 1102–03.

More relevant at this point of the analysis, however, is the government's argument that the foreign murder statute is constitutional under Congress's broad authority over external affairs, and what *Clark* has to say on that score. In fact, *Clark* strongly suggests that an alternative basis for upholding the constitutional validity of § 2423(c) would have been Congress's plenary power over foreign affairs had the argument been advanced by the government:

> Our review of the constitutionality of § 2423(c) is focused on congressional authority under the Commerce Clause. As pointed out by the Government, the Supreme Court once remarked in a case involving the delegation of legislative power to the Executive that "[t]he broad statement that the federal government can exercise no powers except those specifically enumerated in the Constitution, and such implied powers as are necessary and proper to carry into effect the enumerated powers, is categorically true only in respect of our internal affairs." *United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 315–16, 57 S.Ct. 216, 81 L.Ed. 255 (1936). Standing alone, however, this reference does not establish that the Foreign Commerce Clause has no meaning or is without bounds. Nor does it necessarily mean that con-

gressional regulation of external affairs has no limits. The Government has not argued—nor is there any indication in the legislation—that Congress enacted § 2423(c) based on an implied foreign affairs power. *Cf. United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1077 (9th Cir.1998) (noting that in exercising immigration power, which falls into the arena of foreign affairs, "Congress is not subject to the rigid constraints that govern its authority in domestic contexts"). Nonetheless, given our charge to uphold the statute absent a plain showing that it is unconstitutional, *United States v. Morrison*, 529 U.S. 598, 607, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), we acknowledge that Congress's plenary authority over foreign affairs may also provide a sufficient basis for § 2423(c). *See, e.g., Curtiss-Wright Export Corp.*, 299 U.S. at 315, 57 S.Ct. 216; *United States v. Belmont*, 301 U.S. 324, 331, 57 S.Ct. 758, 81 L.Ed. 1134 (1937) ("[C]omplete power over international affairs is in the national government . . .").

*Clark*, 435 F.3d at 1109 n. 14.

■ Here, the government has advanced, as a basis for § 1119's constitutionality, Congress's plenary power over "external affairs," citing *Curtiss-Wright* as seminal authority for its position, a position imbued with logic and common sense. Simply stated, if Congress can constitutionally proscribe foreign sexual exploitation of a minor by a United States citizen as a function of its power over foreign affairs, it may undoubtedly criminalize the murder of one American by another American in a foreign country. How else would such a perpetrator be held to answer? No individual state would have jurisdiction to prosecute the case, and foreign prosecution would be problematic for many reasons.

For the foregoing reasons, this court holds that Congress's authority over for-

eign affairs provides a constitutional basis for § 1119. Moreover, to the extent that the extraterritorial principles discussed above would lend not only foreign reach to § 1119, but also serve as an independent constitutional basis for a statute's enactment, as suggested by *King*, the principles of nationality and territoriality serve to buttress the underlying constitutionality of § 1119.

### 2. The Foreign Commerce Power

Alternatively, the government proposes that § 1119 is a valid exercise of Congress's foreign commerce power because, in its view, one American killing another American in a foreign jurisdiction inherently involves an element of commerce. It observes that courts have described Congress's foreign commerce power as "sweeping" and "plenary." *Clark*, 435 F.3d at 1109. It also points out, as the Ninth Circuit has, that the Supreme Court's contraction of the interstate commerce power in *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), and *United States v. Morrison*, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), was driven by concerns about federalism and states' rights, which have no bearing on the foreign commerce power. *See Clark*, 435 F.3d at 1111–13. "Although the Constitution, Art. I, § 8, cl. 3, grants Congress power to regulate commerce 'with foreign Nations' and 'among the several States' in parallel phrases, there is evidence that the Founders intended the scope of the foreign commerce power to be greater." *Japan Line, Ltd. v. Cnty. of Los Angeles*, 441 U.S. 434, 448 & nn. 12–13, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979). "In fact, the Supreme Court has never struck down an act of Congress as exceeding its powers to regulate foreign commerce." *Clark*, 435 F.3d at 1113.

Whether the foreign commerce clause can be a basis for § 1119 is a matter of first impression. The closest cases from this circuit appear to be *United States v. Cummings*, 281 F.3d 1046 (9th Cir.2002), and *Clark*, 435 F.3d 1100, which was discussed in the previous section.

In *Cummings*, the Ninth Circuit held that Congress had authority under the foreign commerce power to enact the Parental Kidnapping Crime Act, which criminalizes the removal and retention of a kidnapped American child in a foreign country. *See* 281 F.3d at 1050. Cummings did not challenge the "removal" aspect of the statute, only Congress's authority to "criminalize the *retention* of an American child in a foreign country." *Id.* at 1048. The analysis relied on the ordinary commerce test from *United States v. Lopez*, under which Congress can regulate the use of channels of commerce, the instrumentalities of commerce or persons in commerce, and activities that have a substantial effect on commerce. *See id.* at 1049 (citing *Lopez*, 514 U.S. at 558–59, 115 S.Ct. 1624). Applying the *Lopez* test, the court held that the foreign commerce power gave Congress authority to prohibit the retention of children abroad because they had traveled in commerce before they were retained, and retaining them prohibited them from returning. *See id.* at 1050 ("Not only does § 1204(a) target activity after the use of channels of foreign commerce is complete, but it also removes an impediment to the use of those channels.").

Along similar lines, in *Clark*, the Ninth Circuit held that Congress had authority under the foreign commerce clause to punish foreign commercial sexual activities with children that occurred within two months after the defendant's most recent travels. *See* 435 F.3d at 1109–17. But,

rather than slavishly applying the *Lopez* test, the court in *Clark* simply asked whether there was a "rational relationship" or "rational nexus" with foreign commerce. *See id.* at 1114, 1117. It concluded that there was the required nexus because the defendant had traveled in foreign commerce and he had paid the children for sex. *See id.* at 1116.

■ Here there are no allegations that money changed hands, but Defendant's alleged crime is otherwise similar to the crimes in *Cummings* and *Clark*. The government alleges that he flew to Panama with Baldelli and killed her two months later. Thus, he and Baldelli allegedly used the channels of foreign commerce before the murder, and Baldelli's death prevented her from returning through those channels.[2] Thus, at least under Ninth Circuit standards, the nexus requirement appears to be met.

Defendant objects that § 1119 has no explicit commerce requirement, and, unlike crimes such as bank fraud and healthcare fraud, murder itself has no inherent commercial element. That is true. However, Defendant does not address or distinguish *Cummings* or *Clark* or explain why the Ninth Circuit's rational nexus test is not met under the facts of this case. Nor does he provide any meaningful analysis of why foreign murder (as opposed to ordinary murder) has no inherent commercial element. Moreover, although he renews his objection that this approach leaves Congress without limits, he does not develop that argument or provide any authority discussing the issue. Indeed, to the extent that his arguments reflect Judge Ferguson's dissent in *Clark*, which raised similar concerns, the majority of a panel of the Ninth Circuit has considered and rejected

---

**2.** Additionally, Defendant allegedly used the Internet and Baldelli's bank account to cover

up her disappearance before he returned to the United States.

them. *See* 435 F.3d at 1117–21. Thus, Defendant has not plainly shown that Congress's foreign commerce power cannot be a basis for § 1119.

Accordingly, Defendant's' motion to dismiss the foreign murder charge because § 1119 exceeds Congress's powers 'is denied for all the reasons set forth above.

## B. The Extradition Treaty and Judicial Review

Defendant also contends that § 1119 cannot be used because there is a valid extradition treaty between the United States and Panama that includes murder as an extraditable offense. He relies on § 1119(c)(2), which, as noted earlier, requires the Attorney General, in consultation with the Secretary of State, to determine that the country where the killing occurred "lacks the ability to lawfully secure the person's return."

However, the next sentence of the statute plainly prohibits the court from reviewing that determination. *See* 18 U.S.C. § 1119(c)(2) ("A determination by the Attorney General under this paragraph is not subject to judicial review.").

Anticipating this, Defendant argues that he has a due-process right to judicial review of the Attorney General's determination under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), *Alleyne v. United States*, —— U.S. ——, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013), and two immigration cases; *United States v. Mendoza–Lopez*, 481 U.S. 828, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987), and *United States v. Barajas–Alvarado*, 655 F.3d 1077 (9th Cir.2011). In his view, these cases require judicial review because the determination increased the floor and the ceiling of the penalties he faces, and it will play a critical role in the mandatory-minimum life sentence he will receive if he is convicted.

These cases are entirely inapposite here. Under *Apprendi*, other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be treated as an element of the crime and must be submitted to a jury and proved beyond a reasonable doubt. *See* 530 U.S. at 490, 120 S.Ct. 2348. Along similar lines, under *Alleyne*, any fact that increases the mandatory minimum sentence for a crime must be submitted to a jury. *See* 133 S.Ct. at 2155.

*Mendoza–Lopez* recognized an alien's due-process right to collaterally attack an immigration judge's prior deportation order in a subsequent criminal proceeding for illegal reentry because the prior order was to be used to establish an element of the criminal offense. *See* 481 U.S. at 838–39, 107 S.Ct. 2148. *Barajas–Alvarado* extended this holding to expedited removal orders, which Congress expressly precluded from judicial review. *See* 655 F.3d at 1087.

■■■ Here, however, according to the plain terms of the statute, the Attorney General's determination is a limit on prosecution, not an element of the offense. *See* 18 U.S.C. § 1119(b) ("Offense")-(c) ("Limitations on Prosecution"). Further, the Attorney General's determination is not functionally an element of the offense, for purposes of *Apprendi* and *Alleyne*, because it does not increase the maximum or minimum sentence for the crime of foreign murder. Certainly, the determination is a procedural prerequisite for what ultimately may lead to a conviction or sentence for murder, but only in the sense that it constrains the government's prosecutorial discretion to file the charge in the first place. That is not the same kind of predicate these cases address.

Hence, this court agrees with the other courts that have held that the determination required by § 1119(c)(2) relates only

to the prosecutor's discretion whether to prosecute, does not implicate due process under *Apprendi*, and is not reviewable. *See United States v. Wharton*, 320 F.3d 526, 532–35 (5th Cir.2003) ("[W]e find that preclusion from judicial review under § 1119(c)(2) does not violate Defendant's due process rights under the Fifth Amendment."); *United States v. Nipper*, 198 F.Supp.2d 818, 820–21 (W.D.La.2002) ("Whatever the rationale for the Attorney General's decision, it is not subject to the scrutiny of this court."); *United States v. White*, 51 F.Supp.2d 1008, 1012 (E.D.Cal. 1997) ("Congress was well within its authority to repose the determination to prosecute exclusively with the Attorney General.").

Additionally, to the extent that the determination involves judgment of a foreign nation and its actual ability to secure the return of an American national under the circumstances of a particular case, Congress properly insulated it from judges or juries and reposed it in the Executive branch. Defendant's motion to dismiss the murder charge on this basis is, therefore, denied.

## C. Request for Discovery

Last, Defendant requests an order under Federal Rule of Criminal Procedure 16 requiring the government to produce its communications underlying the decision to file the murder charge, so that it is possible to determine whether Panama has the ability to secure his return.

This request is denied. The information Defendant seeks is not exculpatory because it does not relate to guilt or punishment, it is not relevant under the foregoing analysis, and it is not subject to disclosure under Rule 16. *See* Fed. R.Crim.P. 16(a)(2); *Nipper*, 198 F.Supp.2d at 821 & n. 2 (describing a similar request as "sophistry").

## CONCLUSION

Defendant's motions to dismiss the foreign murder charge, and for discovery of the government's communications, (Doc. Nos. 91 & 92), are DENIED.

IT IS SO ORDERED.